IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Michael Cormier, Individually and as
Executor of the Estate of Catherine
Heppner, and Michael Cormier, as
Parent and Next Friend of J.C.

vs.

Securitas Security Services USA, Inc.
and Cadient, LLC

Docket No. _____

## PLAINTIFF'S COMPLAINT

### INTRODUCTION

1.      Forty-six year-old Cassie Heppner was living the life about which she had always

dreamed: she was a happily married wife.  She was a doting mother to her cherished

eight-year-old son.  She was a already a Vice President and a rising star at an established

international corporation.  She was universally beloved by her family, friends, and colleagues.

And she is now dead, because the defendants allowed a profoundly troubled young man – Robert

Pavao – with zero security experience and no real professional experience of any kind, to work

unsupervised as a security guard at Cassie's private, isolated office.  They did so despite being

aware that, in recent years, many of the guards they had deemed trustworthy and sound had

committed a variety of heinous criminal acts against the people they were duty-bound to protect;

and they continued to do so, even after one of their own employees learned some truly disturbing

information about Mr. Pavao.  Predictably, Robert Pavao was neither trustworthy nor mentally

sound, consistent with his behavior on the job and with the behavior of other Securitas officers

before him: He killed Cassie during one of his security shifts, when he was supposed to be

protecting her.

2.     Defendant Securitas USA promotes the duty of its security officers as "protect[ing] homes, workplaces, and communities by providing the well-being needed to . . . safeguard their people."  Yet, in this case, by failing to appropriately screen; failing to appropriately supervise; and failing to appropriately raise the alarm in the presence of concerning behaviors, the defendants put in this position of access and power an individual from whom Cassie and others needed safeguarding.  As a result of the defendants' conduct, Mike Cormier lost his wife, J.C. lost his mother, the Timberland Corporation lost one of its most promising employees, and the greater New Hampshire community lost a bright light.

PARTIES

3.     The plaintiff, Michael Cormier, resides at 2 Dunning Court, Exeter, New Hampshire 03833.  He is the surviving spouse of Catherine Heppner, the executor of Catherine Heppner's estate, and the father of Catherine's son, J.C.

4.     Defendant Securitas Security Services USA, Inc. is a Delaware corporation registered to do business in New Hampshire, with a principle place of business located at 9 Campus Drive, Parsippany, New Jersey 07054.

5.     Defendant Cadient, LLC is a Delaware limited liability company with a principle place of business located at 1010 Sync Street, Suite 150, Morrisville, North Carolina 27560.

JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a) because the adverse parties are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

7.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2).

2

FACTUAL BACKGROUND

8.      Catherine "Cassie" Heppner, a happily married mother of a young son, was employed as the Vice President of Marketing in the corporate office of Timberland Pro, located in Stratham, New Hampshire.  She was forty-six years old when she died on February 9, 2020.

9.      Beginning in 2009, Securitas Security Services USA provided security guards for Timberland's offices under a contractual agreement with Timberland.

10.      Securitas bills itself as the largest security firm in the world and the leader in protective services in the United States.  It employs 370,000 people worldwide and claims to help companies of all sizes achieve superior security results.

11.      Securitas's business model is simple: It employs security guards and rents them to businesses at an hourly rate.  It makes its money by paying the lowest possible hourly rate to those guards while charging its customers the highest possible hourly rate.

12.      Securitas's business model requires an ample supply of cheap employees willing to perform work that is largely solitary and tedious, yet carries the constant potential for danger, and provides those employees with direct access to people in private, and often isolated, environments.  To maximize its profits, Securitas cannot afford to be too picky in its selection process or too thorough in its supervision.

13.      The only requirements a person must meet in order to apply for a Securitas security guard position are the following:

- At least age 18.
- A reliable means of communication.
- A reliable means of transportation.
- The legal right to work in the United States.
- The ability to effectively speak, read and write English (each tested to do so).
- A high school diploma or GED.
- Willingness to participate in the company's pre-employment screening process, including a background investigation and drug screen.

14.    Despite its obvious incentive to relax its hiring and supervision standards, Securitas claims that, in addition to these basic requirements, it engages in a selection process that "goes well beyond the industry norm to focus on selecting world-class employees."

15.    Securitas states that its self-described screening process is intended to ensure that it hires security guards who demonstrate the following core characteristics: a) a stable work history; b) well-developed interpersonal communication skills and professional composure; c) drug free; d) the ability to provide high quality customer service; e) the ability to exercise good judgment and discretion; f) the ability to deal courteously, tactfully, and effectively with others; g) initiative, integrity, and high ethical standards; and h) the ability to maintain professional composure when dealing with unusual circumstances.

16.    Securitas has known for many years that some of the "world-class employees" who pass its screening process and are deployed to customer sites in Securitas uniforms with security guard authority have engaged in extraordinarily dangerous and harmful misconduct.

17.    In 2004, Securitas learned that one of its security guards, who allegedly was emotionally unstable and had a propensity for violence, had assaulted a truck driver at a customer's site in Channahon, Illinois after getting into an argument with the driver.  The guard subsequently pled guilty to battery.

18.     In 2005, Securitas learned that one of its guards inexplicably shot a man in a hotel parking lot in Tupelo, Mississippi, while allegedly acting within the scope of his employment and using the handgun he had been issued by Securitas.

19.     In 2005, Securitas learned that one of its guards stationed at a customer's workplace in Osceola, Wisconsin had downloaded photographs of approximately thirty female employees of the customer, which he had access to through his position as a security guard, printed those photographs at home, ejaculated on them, and posted the adulterated photos on the Internet.

20.     In 2008, Securitas learned that one of its security guards stationed at a corporate office in Norwalk, Connecticut had used his key to enter a female worker's office after hours on several occasions, and, among other things, masturbated and ejaculated into a carafe on her desk.

21.     In 2008, Securitas learned that one of its security guards stationed at a Rockville, Maryland courthouse had committed a racially motivated assault on a visitor in which the guard shoved his metal detector into the visitor's genitals, pushed the visitor, and ripped his clothing.

22.     In 2010, Securitas learned that one of its security guards, who was driving a company vehicle in Chelsea, Massachusetts, had attempted to flee from a traffic stop and tried to run down a State Trooper before finally crashing into a police cruiser.  A news article reported that Securitas attended the guard's subsequent court hearing and was investigating whether he was on the clock during the alleged events.

23.     In 2013, Securitas learned that one of its security guards in Worcester, Massachusetts had accidentally shot a friend while the two reportedly were trying to determine whether a gun or a knife could be drawn faster in a scenario reminiscent of an Old West duel.  A

news report quoted a Securitas executive as saying the company had "grave concerns" about the matter and had placed the guard on administrative leave.

24.     In 2015, Securitas learned that one of its security guards in Hawaii had been convicted on five counts of sexually abusing a child.

25.     In 2016, Securitas learned that one of its security guards stationed in San Diego, California had attacked a person whom he thought was driving unsafely.  The guard, in full Securitas uniform, followed the driver from a parking lot into an unrelated business and confronted him, knocking him to the ground where he hit his head and lost consciousness.

26.     In 2017, Securitas learned that one of its security guards, whom it had actually hired on two separate occasions, deliberately drove his car into a group of anti-white supremacist demonstrators in Charlottesville, Virginia, killing one and injuring nineteen others.

27.     In June of 2019, Securitas learned that one of its security guards working at a retail shop in Boston, Massachusetts had assaulted an 11 year old girl he suspected of shoplifting. According to news reports quoting a statement from the district attorney's office, the Securitas guard grabbed the girl, pulled her back into the store, and pushed her into a corner, obstructing the view of a security camera.  The district attorney's statement describes what happened next as follows: For more than seven minutes, the 6-foot-1-inch, 225-pound guard allegedly grabbed the girl by her head and neck, threw her to the ground, and punched her in the face while straddling her.  Both the guard and Securitas were charged with assault and battery on a child under 14 and civil rights violations.

28.     With respect to the criminal charge against Securitas, the Massachusetts district attorney's office explained that to prove corporate liability the Commonwealth had to show that an individual committed a criminal offense, that the individual who committed the offense was involved in a corporate business, and that the individual was vested with authority to act for the corporation with respect to that business.  The district attorney's office stated that these thresholds had been met and exceeded in that case.

29.     The wide range of security guard misconduct detailed in the cases above, all of which Securitas was aware of by the summer of 2019, demonstrates that such misconduct was not only foreseeable to Securitas, but that it had actual knowledge of the threat of harm posed by its employees when it staffed an open position at Timberland in the fall of 2019.

30.     Securitas's awareness of the foregoing incidents also demonstrates that it knew in 2019 that its screening process, preemployment assessments, and supervision efforts had been woefully inadequate for many years.

31.     Securitas and Timberland entered into a contractual agreement in 2009 under which Securitas agreed to provide "business services" to Timberland "using the highest degree of skill, professionalism, and care."

32.     The contract required Securitas to "provide security personnel to Timberland for security coverage of selected Timberland property, including Timberland's headquarters in Stratham, NH."  The contract granted Securitas compensation from Timberland in the amount of $16.53 per hour for the hours worked by Securitas guards.

33.     In the contract, Securitas accepted sole responsibility "to interview, test, hire, fire, train, assign, reassign, schedule, supervise, discipline, evaluate and counsel its employees."

34.     The contract mandated that Securitas require its security guards assigned to Timberland to sign a document entitled Agreement with Respect to Services Performed for the Timberland Company.  Among the obligations set forth in the agreement is the requirement that the security guard obey all laws while providing services at Timberland.

35.     The contract between Securitas and Timberland stated that Securitas was solely responsible for the training and supervision of the security guards and that each guard "shall be fully trained . . ."

36.     The contract between Securitas and Timberland required all security guards assigned to Timberland to undergo "drug testing performed by a testing lab which has been certified by the United States Department of Health and Human Services and/or applicable state or local laws and regulations and in accordance with the Federal Procedures for Transportation Workplace Drug and Alcohol Testing Programs . . ."

37.     Securitas agreed to screen security guard candidates and not to assign anyone to Timberland if it had "any . . . information indicating that the employee poses a significant risk to the health and safety of others or that the employee exhibits current violent or physically abusive behavior that cannot be eliminated by reasonable accommodation."

38.     Securitas agreed that its services "shall be provided in accordance with the written orders provided by Timberland from time to time."  These orders were maintained in a comprehensive set of "Post Duties" set forth in a lengthy document.

39.     Since the contract between Securitas and Timberland was created in 2009, it was reaffirmed and amended on an annual basis by agreement of the parties.  For the contract term running from January 1, 2020 through December 21, 2020, the amended terms of the contract

called for Securitas to be paid $21.18 per hour for each hour a security guard worked at the Timberland office.

40.     The Post Duties establish a number of specific obligations on the part of Securitas guards working at Timberland.  They direct Securitas guards to contact their Securitas supervisor anytime they are uncertain what to do or in the case of an emergency.  They also require Securitas guards to complete an incident report detailing any unusual incidents.

41.     In the Timberland Post Duties, Securitas pledges to provide the highest quality security services available in the industry.  It describes its objectives to include serving as a deterrent to criminal acts and violence, protecting personnel, and observing and reporting safety concerns.

42.     In September 2019, Robert Pavao applied for a security guard position with Securitas.  He was twenty years old, with a high school diploma and no experience as a security guard.  His last job was at a gas station and he had only recently relocated with his adoptive parents to Maine after living in Massachusetts his whole life.

43.     Mr. Pavao had endured a brutal childhood and was abandoned by his birth parents as a young boy.  His adolescence was marked by learning disabilities, apparent social delays, a complicated sexual identity, and intense anger towards his birth mother, with whom he had no contact.  Mr. Pavao regularly used drugs during high school and afterwards.

44.     At the beginning of the Securitas application process, Mr. Pavao completed an online assessment developed and implemented for Securitas by Cadient, expressly for the stated purpose of helping Securitas screen competent candidates for security guard positions.

45.    The Cadient assessment, identified as the "Securitas Employment Assessment Tool (SEAT II)," must be successfully completed by any security officer candidate as part of the application process.

46.    According to Securitas, "SEAT II was created specifically for Securitas and is comprised of custom content questions designed to assess an applicant's ability and readiness to perform the functions of a security officer."

47.    Securitas claims that the SEAT II questions were developed by subject matter experts and are intended to probe whether the candidate has the knowledge, skills, abilities and personal characteristics that a security guard must possess on the first day of work.

48.    Mr. Pavao completed his SEAT II assessment in September of 2019 and it was interpreted by Cadient.  Cadient reported to Securitas that Mr. Pavao had no concerning qualities or red flags.

49.    In reliance upon Cadient's interpretation of Mr. Pavao's assessment, Securitas decided that Mr. Pavao was a qualified candidate for a security guard position.

50.    Securitas contacted some of Mr. Pavao's prior employers, checked his criminal record, and administered a rudimentary in-office drug screen by swabbing his mouth, before hiring Mr. Pavao and assigning him to work at the Timberland workplace.

51.    Securitas did not have Mr. Pavao sign the Agreement with Respect to Services Performed for the Timberland Company as required by Securitas's contract with Timberland. Nor did it subject Mr. Pavao to drug testing performed by a certified lab as required by its contract with Timberland.

52.     Securitas did not contact any of the personal references Mr. Pavao identified on his application before hiring him.  And, although it was aware of a long period of unemployment after high school, and a discrepancy between Mr. Pavao's reported dates of one prior employment and the dates confirmed by the prior employer, Securitas did not follow up on these red flags. Securitas failed to do the minimum vetting that a reasonable employer would normally do in the hiring process.

53.     Mr. Pavao started working for Securitas as a security guard at Timberland in early October 2019.  His rate of pay was $13 per hour.  His site specific training consisted of a few shifts shadowing another Securitas guard.  Securitas failed to comply with the training obligations it undertook in its contract with Timberland.

54      After that, he worked the overnight and weekend shift by himself without Securitas supervision.  From October 5, 2019 through February 8, 2020, Mr. Pavao worked fifty-seven unsupervised twelve hour shifts at Timberland on behalf of Securitas.  Securitas failed to comply with the supervision and evaluation obligations it undertook in its contract with Timberland.

55.     At one point after working for Securitas at Timberland for several months, Mr. Pavao asked a more senior Securitas guard whether the Timberland surveillance cameras had audio recording capability.  When the superior guard replied that he did not know, Mr. Pavao told him, "If they see me on the camera they will see me screaming."

56.     The superior guard considered Mr. Pavao's statement about screaming to mean that Mr. Pavao had had a breakdown while at work and he believed the comment was a serious red flag, but he did not report it to anyone else.

11

57.     The superior guard, whose shift often overlapped with Mr. Pavao's, had observed that Mr. Pavao was antisocial and had significant anxiety.

58.     The superior guard believed that Mr. Pavao smoked marijuana at work and that he used other drugs like mushrooms and LSD.  He did not report these concerns to anyone.

59.     Securitas's Security Officer Handbook directs employees like the superior guard to report any concerns.  The first substantive page of the handbook starts with the bold proclamation, "If you see anything unusual, report it."  This is necessary, the handbook says, to deal with threats like workplace violence.

60.     In oversized, uppercase letters, the handbook expressly tells all Securitas guards: "DO NOT IGNORE SIGNS OR 'RED FLAGS' THAT COULD INDICATE POSSIBLE DANGER.  USE YOUR COMMON SENSE: REPORT UNUSUAL, OUT OF THE ORDINARY AND SUSPICIOUS THINGS AND ACTIVITIES."

61.     Later in the manual, Securitas reiterates to its guards: "Any time you see something or someone unusual, out of the ordinary, or troublesome, alert your manager, or the Securitas Hotline.  Do not ignore signs that could lead to danger."

62.     The handbook alerts guards to the existence of the Securitas Hotline, a confidential reporting system.  According to Securitas, the Hotline "is a way for you to advise Securitas USA in a simple and confidential manner of any situation that may adversely impact Securitas USA, its clients or its employees."

63.     The handbook lists a number of situations that should prompt a timely report to the Securitas Hotline, including concerns about possible violence in the workplace, use of drugs or alcohol on the job, violation of safety and security policies, and violation of any company policy, practice, or procedure.

12

64.    Securitas guards may access the hotline 24 hours a day, seven days a week, by calling a toll free phone number or visiting www.securitashotline.com.  Despite the handbook's mandates and the numerous avenues available to him, Mr. Pavao's superior guard at Timberland did not report his concerns about Mr. Pavao's workplace breakdown or drug use.

65.    The handbook goes on to state that "use of or being under the influence of alcohol, intoxicants, illegal drugs or controlled substances during work hours" is a ground for immediate termination of employment.  The handbook requires all Securitas guards to report any illegal drug activity observed at work to a supervisor, Human Resources, branch management, or the Securitas hotline.  Mr. Pavao's superior guard at Timberland did not report Mr. Pavao's drug use to anyone.

66.    While Mr. Pavao was working unsupervised as a security guard for Securitas at Timberland, surveillance video captured Mr. Pavao acting in a very bizarre manner on several different occasions which raised serious concerns about his suitability and psychological stability. Had Securitas exercised reasonable care in vetting Mr. Pavao, had Cadient exercised reasonable care in the development and implementation of the SEAT II assessment, and had Securitas exercised reasonable care in supervising Mr. Pavao at Timberland, Securitas would have been aware of the unsuitability and psychological instability Mr. Pavao demonstrated on the surveillance video and his assignment at Timberland would have been, or should have been, terminated.  Instead, Mr. Pavao was allowed to work 57 unsupervised shifts as a security guard at Timberland between October 5, 2019 and February 8, 2020 and continued to be employed as a security guard by Securitas at Timberland on February 9, 2020.

67.    On Sunday, February 9, 2020 at 10:30am, Mr. Pavao began his shift as a Securitas security guard at Timberland's 200 Domain Drive, Stratham, New Hampshire office. He was wearing a uniform issued by Securitas consisting of a jacket with a badge on the left breast, a pwhite dress shirt, dark pants, and dark shoes. He carried keys to locked areas of the Timberland corporate office. Mr. Pavao was not supervised by anyone from Securitas.

68.    At some point during the afternoon of February 9, 2020, Cassie Heppner arrived at the Timberland office on her day off to retrieve some items in preparation for a business trip she was scheduled to take the next day.

69.    At approximately 3:20pm, Mr. Pavao, dressed in his Securitas uniform, used a key that had been issued to him to open a locked door for Cassie. After unlocking the door, Mr. Pavao stayed with Cassie as she searched the storage room for the items she needed for her trip.

70.    Surveillance video shows that Cassie and Mr. Pavao interacted and conversed with each other while Cassie searched for her items. During this process, Mr. Pavao went in and out of the room where Cassie was but always stayed nearby. Much of the time, Cassie was outside the view of the camera.

71.    At one point while Cassie was inside the room and outside the camera's view, Mr. Pavao followed her into that area and disappeared from the camera's view with the door still open. At that point, the motion-activated camera stopped recording until it was activated again some time later.

72.    The surveillance camera began recording as Mr. Pavao is seen emerging from the area he had entered with Cassie. He is wearing his Securitas uniform and blood is apparent on his left hand. At approximately 3:42pm, he is seen reaching for the handle of the open door and

closing it as he appears to return to where he had been with Cassie, out of the camera's view.

73.    After another period of time during which the camera did not activate, Mr. Pavao is seen emerging from the room without his jacket and dress shirt on, but still wearing a white T-shirt, along with his dark pants and dark shoes, at approximately 4:33pm.  He is on the phone when he emerges from the room and he is speaking with a 911 operator.

74.    Before emerging from the room and into the view of the camera, Mr. Pavao had called his mother on the phone at approximately 4:13pm and told her he hurt someone at work. He then called 911 at approximately 4:25pm.

75.    The surveillance video shows police arrive and Mr. Pavao points to the now-closed door and tells them that the person who was stabbed is in the room.  He is asked if he stabbed the person and he replies, "I don't know."

76.    Mr. Pavao was eventually taken into custody after police entered the room and found Cassie had suffered two fatal stab wounds to her neck.  He has been charged with alternative counts of first and second degree murder in Rockingham County Superior Court.  He has pled not guilty and his trial is expected to take place before the end of 2021.

77.    Cassie was found on the floor of the storage room naked from the upper chest down.  Her shirts were pulled up exposing her breasts and her pants had been removed. Responders described an horrific scene with massive blood pools and spatter on the walls. Cassie's hands showed defensive wounds, indicating that she was aware of what was happening and attempted to defend herself.

78.     Mr. Pavao was working a regular, paid shift at Timberland on behalf of Securitas and was performing his normal duties of providing Timberland employees access to a locked area and observing their activities in the locked area when he caused Cassie's death.  He was paid by Securitas for the time during which he was causing Cassie's death.

79.     At all relevant times, it was reasonably foreseeable to Cadient and to Securitas that a security guard hired by Securitas, like Mr. Pavao, could physically harm a customer's employee, like Cassie Heppner, while performing his or her duties on behalf of Securitas at a customer's workplace.

COUNT I
(Estate's Battery Claim Against Securitas Security Services USA)

80.     The plaintiff incorporates by reference each of the allegations set forth in paragraphs 1 through 79.

81.     Securitas Security Services USA owed a duty to Cassie Heppner to refrain from engaging in unprivileged physical conduct with her.

82.     Securitas Security Services USA breached this duty when Robert Pavao, acting incidental to or within the scope of his employment with Securitas as a security guard, engaged in unprivileged physical contact with Cassie Heppner on February 9, 2020 while working for Securitas at his normal workplace and while performing his normal employment duties on behalf of Securitas.

83.     As a direct and proximate result of Securitas's breach, Cassie Heppner suffered fatal stab wounds to her neck and died prematurely at the age of 46.

84.     As a further result of Securitas's breach, Cassie Heppner suffered physical pain and emotional distress, her estate suffered the loss of her enjoyment of life, her estate lost the value of her earning capacity, and her estate incurred medical and funeral expenses.

85.     Wherefore, the Estate of Cassie Heppner demands judgment against Securitas Security Services USA in an amount sufficient to compensate the estate for its damages and losses, together with interest and costs.

## COUNT II
### (Estate's Vicarious Liability - Aiding in the Accomplishment Claim Against Securitas Security Services USA)

86.     The plaintiff incorporates by reference each of the allegations set forth in paragraphs 1 through 85.

87.     Securitas Security Services aided Robert Pavao in the accomplishment of his tort against Cassie Heppner by employing him as a security guard at Cassie's workplace, supplying him with a uniform, supplying him with access to the Timberland office, supplying him with keys to locked areas of Timberland's office, and supplying him with the authority of a security guard.

88.     Securitas Security Services USA is vicariously liable for the harm caused to the plaintiffs by Robert Pavao, even if the tort was outside the scope of his employment duties, because Securitas aided him in the accomplishment of his tort by employing him, supplying him, and authorizing him as described above.

89.     If Securitas had not aided Mr. Pavao in the accomplishment of his tort, Cassie Heppner would not have died.

90.     As a result of Securitas's aid, Cassie Heppner suffered physical pain and emotional distress, her estate suffered the loss of her enjoyment of life, her estate lost the value of her earning capacity, and her estate incurred medical and funeral expenses.

91.     Wherefore, the Estate of Cassie Heppner demands judgment against Securitas Security Services USA in an amount sufficient to compensate the estate for its damages and losses, together with interest and costs.

## COUNT III
(Estate's Vicarious Liability - RSA 106-F:9, II Claim Against Securitas Security Services USA)

92.     The plaintiff incorporates by reference each of the allegations set forth in paragraphs 1 through 91.

93.     Pursuant to R.S.A. 106:F:9, II, a security agency licensed in New Hampshire, like Securitas Security Services USA, that employs guards, like Robert Pavao, is responsible for the conduct of any such employees.

94.     Since Mr. Pavao was working for Securitas when he caused Cassie Heppner's death, Securitas is vicariously liable for the harm Mr. Pavao caused to the plaintiffs.

95.     If Mr. Pavao was not employed by Securitas on February 9, 2020, he would not have caused Cassie Heppner's death.

96.     As a result of Securitas's employment of Robert Pavao, Cassie Heppner suffered physical pain and emotional distress, her estate suffered the loss of her enjoyment of life, her estate lost the value of her earning capacity, and her estate incurred medical and funeral expenses.

97.     Wherefore, the Estate of Cassie Heppner demands judgment against Securitas Security Services USA in an amount sufficient to compensate the estate for its damages and losses, together with interest and costs.

COUNT IV

(Estate's Breach of Contract Claim Against Securitas Security Services USA)

98.     The plaintiff incorporates by reference each of the allegations set forth in

paragraphs 1 through 97.

99.     Cassie Heppner, as an employee of Timberland, was a third-party beneficiary

of the contract between Securitas and Timberland.

100.     Securitas breached its contract with Timberland when it assigned Robert Pavao to

work as a security guard at Timberland without engaging in the promised screening activities and

when it continued to assign Mr. Pavao to Timberland without performing the promised

supervision.

101.     As a direct and proximate result of Securitas's breach of contract, Robert Pavao

was working as a security guard at Timberland on February 9, 2020 even though he was not

qualified and was incompetent to do so.

102.     Had Securitas complied with its contractual duties, Mr. Pavao would not have

been working as a uniformed security guard at Timberland on February 9, 2020, he would not

have been unsupervised at Timberland, he would not have been authorized to enter locked areas,

he would not have been supplied with keys to locked areas in the Timberland building, and Cassie

Heppner would not have died.

103.     As a result of Securitas's breach of contract, Cassie Heppner, a third party

beneficiary of the contract, suffered physical pain and emotional distress, her estate suffered the

loss of her enjoyment of life, her estate lost the value of her earning capacity, and her estate

incurred medical and funeral expenses.

19

104.     Wherefore, the Estate of Cassie Heppner demands judgment against Securitas Security Services USA in an amount sufficient to compensate the estate for its damages and losses, together with interest and costs.

COUNT V
(Estate's Negligent Hiring Claim Against Securitas Security Services USA)

105.     The plaintiff incorporates by reference each of the allegations set forth in paragraphs 1 through 104.

106.     Securitas Security Services USA owed a duty to Cassie Heppner to exercise reasonable care in the hiring of the security guards it assigned, supplied, and authorized to protect her workplace at Timberland.

107.     Securitas Security Services USA breached this duty when it hired Robert Pavao and assigned, supplied, and authorized him to protect employees at Timberland, even though it knew or should have known that Mr. Pavao was unqualified and incompetent to provide unsupervised security services at Timberland.

108.     When Securitas hired, assigned, supplied, and authorized Mr. Pavao to work at Timberland, it was reasonably foreseeable to Securitas that he could physically harm employees there.

109.     As a direct and proximate result of Securitas's breach, Robert Pavao was working as a security guard at Timberland unsupervised on February 9, 2020 even though he was not qualified and was incompetent to do so.

20

110.    Had Securitas exercised reasonable care, Mr. Pavao would not have been working as a uniformed security guard at Timberland on February 9, 2020, he would not have been unsupervised at Timberland, he would not have been authorized to enter locked areas, he would not have been supplied with keys to locked areas in the Timberland building, and Cassie Heppner would not have died.

111.    As a result of Securitas's breach, Cassie Heppner, a foreseeable victim, suffered physical pain and emotional distress, her estate suffered the loss of her enjoyment of life, her estate lost the value of her earning capacity, and her estate incurred medical and funeral expenses.

112.    Wherefore, the Estate of Cassie Heppner demands judgment against Securitas Security Services USA in an amount sufficient to compensate the estate for its damages and losses, together with interest and costs.

## COUNT VI
### (Estate's Negligent Retention and Supervision Claim Against Securitas Security Services USA)

113.    The plaintiff incorporates by reference each of the allegations set forth in paragraphs 1 through 112.

114.    Securitas Security Services USA owed a duty to Cassie Heppner to exercise reasonable care in the retention and supervision of the security guards it assigned, supplied, and authorized to protect her workplace at Timberland.

115.    Securitas Security Services USA breached this duty when it permitted Robert Pavao to protect employees at Timberland even though it knew or should have known that Mr. Pavao was unqualified and incompetent to provide security services at Timberland.

116.    Securitas Security Services USA breached this duty, in addition, when it permitted Robert Pavao to protect employees at Timberland without adequate supervision even though it knew or should have known that Mr. Pavao was unqualified and incompetent to provide unsupervised security services at Timberland.

117.    When Securitas permitted Mr. Pavao to work at Timberland without adequate supervision, it was reasonably foreseeable to Securitas that he could physically harm employees there.

118.    As a direct and proximate result of Securitas's breach, Robert Pavao was working as a security guard at Timberland unsupervised on February 9, 2020 even though he was not qualified and was incompetent to do so.

119.    Had Securitas exercised reasonable care, Mr. Pavao would not have been working as a uniformed security guard at Timberland on February 9, 2020, he would not have been unsupervised at Timberland, he would not have been authorized to enter locked areas, he would not have been supplied with keys to locked areas in the Timberland building, and Cassie Heppner would not have died.

120.    As a result of Securitas's breach, Cassie Heppner, a foreseeable victim, suffered physical pain and emotional distress, her estate suffered the loss of her enjoyment of life, her estate lost the value of her earning capacity, and her estate incurred medical and funeral expenses.

121.    Wherefore, the Estate of Cassie Heppner demands judgment against Securitas Security Services USA in an amount sufficient to compensate the estate for its damages and losses, together with interest and costs.

22

COUNT VII
(Estate's Negligence Claim Against Securitas Security Services USA)

122.    The plaintiff incorporates by reference each of the allegations set forth in paragraphs 1 through 121.

123.    Securitas Security Services USA owed a duty to Cassie Heppner to exercise reasonable care in the protection of Timberland employees.

124.    Securitas Security Services USA breached this duty when, acting by and through its security guard on site at Timberland, it failed to timely respond to a known security threat posed by Robert Pavao, when the on site security guard learned that Mr. Pavao was antisocial and suffered from anxiety, had experienced a breakdown at work, admitted to screaming while alone at Timberland, and was likely using illegal drugs while on duty.

125.    Timberland's on site security guard had been directed several times that he was obligated to report his concerns to Securitas for the protection of foreseeable victims like Cassie Heppner, yet he did not tell anyone about his concerns regarding Robert Pavao.

126.    Had Timberland's on site security guard reported his concerns about Mr. Pavao to Securitas, Mr. Pavao would not have been working as a uniformed security guard at Timberland on February 9, 2020, he would not have been unsupervised at Timberland on that date, he would not have been authorized to enter locked areas, he would not have been supplied with keys to locked areas in the Timberland building, and Cassie Heppner would not have died.

127.    As a result of Securitas's breach, Cassie Heppner, a foreseeable victim, suffered physical pain and emotional distress, her estate suffered the loss of her enjoyment of life, her estate lost the value of her earning capacity, and her estate incurred medical and funeral expenses.

23

128.    Wherefore, the Estate of Cassie Heppner demands judgment against Securitas Security Services USA in an amount sufficient to compensate the estate for its damages and losses, together with interest and costs.

## COUNT VIII
### (Estate's Negligence - Voluntary Undertaking Claim Against Securitas Security Services USA)

129.    The plaintiff incorporates by reference each of the allegations set forth in paragraphs 1 through 128.

130.    Securitas Security Services USA voluntarily undertook a duty to exercise reasonable care in the protection of Timberland employees.

131.    Securitas Security Services USA breached this voluntarily undertaken duty when, acting by and through its security guard on site at Timberland, it failed to timely respond to a known security threat posed by Robert Pavao, when the on site security guard learned that Mr. Pavao was antisocial and suffered from anxiety, had experienced a breakdown at work, admitted to screaming while alone at Timberland, and was likely using illegal drugs while on duty.

132.    Timberland's on site security guard had been directed several times that he was obligated to report his concerns to Securitas for the protection of foreseeable victims like Cassie Heppner, yet he did not tell anyone about his concerns regarding Robert Pavao.

133.    Had Timberland's on site security guard reported his concerns about Mr. Pavao to Securitas, Mr. Pavao would not have been working as a uniformed security guard at Timberland on February 9, 2020, he would not have been unsupervised at Timberland on that date, he would not have been authorized to enter locked areas, he would not have been supplied with keys to locked areas in the Timberland building, and Cassie Heppner would not have died.

134.     As a result of Securitas's breach, Cassie Heppner, a foreseeable victim, suffered physical pain and emotional distress, her estate suffered the loss of her enjoyment of life, her estate lost the value of her earning capacity, and her estate incurred medical and funeral expenses.

135.     Wherefore, the Estate of Cassie Heppner demands judgment against Securitas Security Services USA in an amount sufficient to compensate the estate for its damages and losses, together with interest and costs.

COUNT IX
(Estate's Negligence Claim Against Cadient, LLC)

136.     The plaintiff incorporates by reference each of the allegations set forth in paragraphs 1 through 135.

137.     Cadient, LLC owed a duty to Cassie Heppner to exercise reasonable care in the development and implementation of the assessment tool it provided to Securitas to ensure that the assessment tool properly identified security guard candidates who posed an unreasonable risk of harm to foreseeable victims.

138.     Cadient breached this duty when it developed and provided the SEAT II to Securitas in a defective and dangerous condition such that it did not properly identify Robert Pavao as a dangerous, incompetent, or unfit candidate to be a security guard, and when it negligently implemented and reported Mr. Pavao's SEAT II to Securitas in a manner that allowed him to be considered by Securitas as a candidate for a security guard position, when Mr. Pavao should have been identified as dangerous, incompetent, or otherwise unfit to be a security guard.

25

139.    It was reasonably foreseeable to Cadient when it was developing, providing, and implementing the SEAT II for Securitas that a security guard candidate improperly reported as qualified could physically injure an employee of Securitas's customer.

140.    Had Cadient exercised reasonable care in the development and implementation of the SEAT II for Securitas, Robert Pavao would not have been reported as qualified for the position of security guard, Mr. Pavao would not have been working as a uniformed security guard at Timberland on February 9, 2020, he would not have been unsupervised at Timberland on that date, he would not have been authorized to enter locked areas, he would not have been supplied with keys to locked areas in the Timberland building, and Cassie Heppner would not have died.

141.    As a result of Cadient's breach, Cassie Heppner, a foreseeable victim, suffered physical pain and emotional distress, her estate suffered the loss of her enjoyment of life, her estate lost the value of her earning capacity, and her estate incurred medical and funeral expenses.

142.    Wherefore, the Estate of Cassie Heppner demands judgment against Cadient, LLC in an amount sufficient to compensate the estate for its damages and losses, together with interest and costs.

## COUNT X
### (Estate's Negligence - Voluntary Undertaking Claim Against Cadient, LLC)

143.    The plaintiff incorporates by reference each of the allegations set forth in paragraphs 1 through 142.

144.    Cadient, LLC voluntarily assumed a duty to Cassie Heppner to exercise reasonable care in the development and implementation of the assessment tool it provided to Securitas to ensure that the assessment tool properly identified security guard candidates who posed an unreasonable risk of harm to foreseeable victims.

26

145.   Cadient breached this duty when it developed and provided the SEAT II to Securitas in a defective and dangerous condition such that it did not properly identify Robert Pavao as a dangerous, incompetent, or unfit candidate to be a security guard, and when it negligently implemented and reported Mr. Pavao's SEAT II to Securitas in a manner that allowed him to be considered by Securitas as a candidate for a security guard position, when Mr. Pavao should have been identified as dangerous, incompetent, or otherwise unfit to be a security guard.

146.   It was reasonably foreseeable to Cadient when it was developing, providing, and implementing the SEAT II for Securitas that a security guard candidate improperly reported as qualified could physically injure an employee of Securitas's customer.

147.   Had Cadient exercised reasonable care in the development and implementation of the SEAT II for Securitas, Robert Pavao would not have been reported as qualified for the position of security guard, Mr. Pavao would not have been working as a uniformed security guard at Timberland on February 9, 2020, he would not have been unsupervised at Timberland on that date, he would not have been authorized to enter locked areas, he would not have been supplied with keys to locked areas in the Timberland building, and Cassie Heppner would not have died.

148.   As a result of Cadient's breach, Cassie Heppner, a foreseeable victim, suffered physical pain and emotional distress, her estate suffered the loss of her enjoyment of life, her estate lost the value of her earning capacity, and her estate incurred medical and funeral expenses.

149.   Wherefore, the Estate of Cassie Heppner demands judgment against Cadient, LLC in an amount sufficient to compensate the estate for its damages and losses, together with interest and costs.

COUNT XI
(Michael Cormier's Consortium Claim Against All Defendants)

150.    The plaintiff incorporates by reference each of the allegations set forth in paragraphs 1 through 149.

151.    At all times relevant, Michael Cormier was the husband of Cassie Heppner.

152.    As a result of the defendants' negligence as set forth above, Michael Cormier suffered the loss of his wife's comfort, society, affection, and companionship.

153.    Wherefore, Michael Cormier demands judgment against the defendants in an amount sufficient to compensate him for his losses, together with interest and costs.

COUNT XII
(J.C.'s Consortium Claim Against All Defendants)

154.    The plaintiff incorporates by reference each of the allegations set forth in paragraphs 1 through 153.

155.    At all times relevant, J.C. has been the minor son of Cassie Heppner and was 8 years old when she died.

156.    As a result of the defendants' negligence as set forth above, J.C. suffered the loss of his mother's comfort, care, affection, and companionship.

157.    Wherefore, J.C. demands judgment against the defendants in an amount sufficient to compensate him for his losses, together with interest and costs.

DEMAND FOR A JURY TRIAL

158.    The plaintiff demands a jury trial.

28

RESPECTFULLY SUBMITTED,

Michael Cormier, Individually, as Executor of the
Estate of Catherine Heppner, and as Parent and
Next Friend of J.C.

By and through his attorneys:

ABRAMSON, BROWN & DUGAN

DATED: February 3, 2021            By:  /s/ Jared R. Green
                                        Jared R. Green, Esquire
                                        NHBA No. 10000
                                        1819 Elm Street
                                        Manchester, NH 03104
                                        (603) 627-1819
                                        jgreen@arbd.com

DATED: February 3, 2021            By:  /s/ Mark A. Abramson
                                        Mark A. Abramson, Esquire
                                        NHBA No. 155
                                        1819 Elm Street
                                        Manchester, NH 03104
                                        (603) 627-1819
                                        mabramson@arbd.com

DATED: February 3, 2021            By:  /s/ Nick A. Abramson
                                        Nick A. Abramson, Esquire
                                        NHBA No. 268560
                                        1819 Elm Street
                                        Manchester, NH 03104
                                        (603) 627-1819
                                        nabramson@arbd.com